UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,
      Plaintiff,                   CASE NO.: 2022-CR-20104-BECERRA

v.

ARCANGEL PRETEL ORTIZ, et al.,
      Defendants.
_____/

## DEFENDANTS' REPLY TO "UNITED STATES' RESPONSE IN OPPOSITION TO RENEWED SEALED JOINT MOTION FOR DEPOSITION PURSUANT TO RULE 15"

**COME NOW**, the Defendants, Antonio Intriago, ("**Intriago**") Arcangel Pretel Ortiz, ("**Ortiz**"), Walter Veintemilla, ("**Veintemilla**") James Solages ("**Solages**") and Christian Sanon ("**Sanon**") (collectively, the "**Accused**") by and through counsel, and in reply to "United States' Response in Opposition to Renewed Sealed Joint Motion for Deposition Pursuant to Rule 15" (the "**Response**") and states as follows in defense:

### THE RESPONSE & SUMMARY OF THE ARGUMENT

1. The Government recognizes that this Court was inclined to grant the Rule 15 motion, originally filed by the Accused, if the Colombian Nationals were "willing to be deposed and willing to waive their Fifth Amendment rights".

2. In response to the Court's directive, the Accused thereafter obtained proof that the sixteen of seventeen Colombian Nationals, which the Accused seek to depose, would in fact waive their Fifth Amendment rights.

3. Nevertheless, the Government still opposes the renewed Rule 15 motion. The Government insists that four grounds justify their opposition:

    a. First, that the motion is "untimely".

1

b. Second, that notwithstanding the fact that 16 of 17 Colombian Nationals executed documents indicating that they waive their *personal* Fifth Amendment right, the waiver is somehow ineffective because the Colombian Nationals are "now represented by Haitian counsel in pending Haitian criminal proceedings."

c. Third, the Government again contends that the "security situation in Haiti has deteriorated" to the point that depositions would be "impossible".

d. Fourth, the Government contends that the depositions of all seventeen proposed witnesses would be cumulative.

4. As to the first and third grounds, these grounds were addressed and dispelled in the Accused's first Rule 15 Motion, and decisional authority cited therein (and briefly reiterated herein) and forecloses these arguments as grounds to deny the Rule 15 motion.

5. As to the second argument, the Government's position overlooks the well-settled fact that Fifth Amendment rights are personal and are to be enforced or waived by the individual who they exist to protect: i.e., each of the Colombian Nationals. Furthermore, and regardless, the notion that the humanitarian attorney assisting the Colombian Nationals is somehow unequipped to advise them regarding their rights is speculative at best and has no factual basis whatsoever. Finally, under the circumstances of this case it is unlikely that the Colombian Nationals would have grounds to assert their Fifth Amendment rights, as the Government emphasizes in their Response, that the proposed testimony would exculpate (rather than incriminate) the Colombian Nationals.

6. As to the fourth argument the Accused have an absolute constitutional right to present a defense, and the preservation of such right depends on the fullest testimony possible regarding the ongoings in Haiti and observations of each of the Accused's conduct in

connection therewith in the days, weeks, and even *months* before the assassination of President Moise occurred. Each of the witnesses that the Accused seek to depose had a different vantage point; was present at different events throughout the weeks preceding the assassination and has independently relevant testimony as to the involvement of the Accused and their actions (highly relevant to the *knowledge* and *intent* of the Accused) during the critical period  leading up to the assassination of President Moise. Without the unique vantage point of each witness, the Accused simply cannot put on a full defense to the charges at issue in the Indictment.

7. Ultimately, the Government's arguments in opposition to the renewed Rule 15 motion improperly attack the potential *admissibility* of any deposition under Rule 15(e), rather than providing countervailing factors which "render the taking [of] the deposition unjust".

8. The Accused have established that the Colombian Nationals are "unavailable" and that they have "material" testimony. As such, their motion should be granted <u>unless</u> the Government can establish "countervailing factors" that would render those depositions "unjust", as to the Government. The Government has not met its "high burden", and the motion must be granted accordingly.

MEMORANDUM OF LAW

I.    <u>LEGAL STANDARD UNDER RULE 15</u>

In ruling on a Rule 15 motion, the Court must determine whether "exceptional circumstances" exist, and the "interest of justice" requires that a witness be deposed, to preserve testimony for trial. *See* Fla. R. Crim. P. 15(a)(1). To determine whether "exceptional circumstances" exist, the Eleventh Circuit has directed that three factors must be considered: (1) "the witness is unavailable to testify at trial"; (2) "injustice will result because testimony material to the movant's case will be

3

absent"; and (3) "countervailing factors render taking the deposition unjust to the nonmoving party." *See United States v. Cordoba*, 2012 U.S. Dist. LEXIS 116801 *11 (S.D. Fla. Aug. 20, 2012) (citing *United States v. Ramos*, 45 F. 3d 1519, 1522-23 (11th Cir. 1995). The party seeking to take a deposition under Rule 15 has the burden of establishing the first two factors above (i.e., unavailability and injustice). However, the party opposing the Rule 15 deposition has the burden of proving "countervailing factors", in the event that the moving party succeeds in showing the first two elements exist in the case. *See United states v. O'Sullivan*, 553 F. Supp. 2d 1349, 1352 (M.D. Fla. 2008). This burden has been classified as a "high burden".

## II.      THE ACCUSED'S BURDEN

Applying the standard above, the Accused have undoubtedly met their burden under Rule 15. The Government has still not challenged the Accused's allegation that the Colombian Nationals are "unavailable", and the record makes clear that this is so.[1] These individuals are incarcerated under brutal conditions in Haiti and will not be (a) subject to the subpoena power; or (b) physically able to appear to testify at trial.

As to the second element, the Accused argue that the ends of justice demand that the depositions be held, because the Colombian Nationals each have relevant and material evidence that is crucial to the defense. The Government has not expressly challenged this allegation. Instead, the Government spends ample page real estate in the Response discussing the previous testimony of several Colombian Nationals. [Response, pp. 2-7]. More specifically, the Government asserts that the testimony is not reliable because it conflicts with previous statements made by these and other Colombian Nationals.

---

[1] A witness is "unavailable" for Rule 15 purposes when "a substantial likelihood exists that the proposed deponent will not testify at trial." *See United States v. Konrad*, 1996 U.S. Dist. LEXIS 18989 *3 (N.D. Ga. Nov. 27, 1996).

4

First and foremost, the Accused have now averredthat the previous statements were made when the Colombian Nationals were suffering torturous conditions. A recently published book in Colombia titled MERCENARIOS, authored by journalist Luis Carlos Vélez, includes excerpts from a letter dated September 6, 2021, signed by all 18 Colombian Nationals detained in connection with the assassination of President Moïse. The letter was addressed to then-President Iván Duque, Vice President and Foreign Minister Marta Lucía Ramírez, the Defensor del Pueblo Carlos Camargo, the Inter-American Commission on Human Rights (CIDH), and the International Committee of the Red Cross. In this letter, the Colombian detainees state unequivocally: *"Las declaraciones dadas a la Policía Judicial fueron bajo tortura, amenazas de tortura y coerción, sin abogado presente."* They further denounce that:*"Los investigadores de la policía judicial ya tenían las declaraciones listas antes de entrevistarlos, requiriéndolos solo para firmar el documento sin saber su contenido."*

> Google Translation: The statements given to the Judicial Police were made under torture, threats of torture, and coercion, without a lawyer present." They further denounce that: "The investigators from the Judicial Police already had the statements ready before interviewing them, requiring them only to sign the document without knowing its content.

In summary, this letter outlines a systematic campaign of torture by Haitian police, occurring prior to and around the time of the July 2021 interviews with U.S. agents. The abuses described in the letter are deeply disturbing and call into question whether any subsequent waivers or statements were truly voluntary. Specific allegations include:

- Manuel Antonio Grosso: struck repeatedly in the testicles, ribs, and stomach; his testicles were burned with spray and a lighter; he was thrown to the ground and beaten in the face.

- Jhon Jairo Ramírez Gómez: his right foot was burned with hot oil, leading to an infection that was deliberately left untreated. *Id.* at 141.

5

- German Rivera: was forced to squat for extended periods, then kicked repeatedly in the anus and testicles for over an hour. His toenails on the right foot were ripped off, and he was beaten with a stapler on his ankle, which was shattered as a result. He subsequently urinated and defecated blood. *Id.* at 140.

- Victims were being burned with hot oil, being attacked with machetes, having their fingernails ripped out, and to having their teeth kicked out. *Id*. at 142.

The Colombians were tortured in this fashion for 22 days.

Ex-military Colombian sent a coded letter to his wife, describing fictional stories or seeking forgiveness for acts he did not commit—messages understood to be covert accounts of the torture he was enduring, such as being beaten until he said what the police wanted to hear, having his injuries from the torture left untreated, causing him prolonged pain, and being deprived of water.

In an exclusive interview given by Colombian National Edwin Blanquicet from a Haitian prison, he stated: The statements made by our comrades are false; we spent 30 days with handcuffs in a cell measuring 3x6 meters for 20 people... Those comrades who appeared in those recordings were taken around 7:30 to 9:00 PM by some hooded individuals. When they returned in the early morning, they were crying, beaten, with their nails torn off, urinating and defecating blood... The confessions...are false and were made under severe torture practices...They beat us on the ribs, on the testicles, on the buttocks...They told us they would kill our families if we didn't confess or incriminate ourselves. *Id.* at 153.

Furthermore, Julio Cesar Santa Martinez, the former Colombian consul in Haiti, visited the detainees 38 times. On one occasion, he was contacted by an FBI agent regarding a Colombian National who was being pressured to sign documents, despite not speaking English, French, or Creole. Mr. Santa confirmed seeing visible injuries on each of the men during his visits.

In addition, officials from Colombia's Defensoría del Pueblo traveled to Haiti to assess the humanitarian conditions of the detainees. Although they were not permitted to ask questions about the legal case and were monitored by Haitian police at all times, they were nonetheless able to observe several of the men with serious injuries requiring medical attention. In one instance, a detainee had to conduct the interview lying on the floor, unable to stand or walk on his own. These findings were documented in a 16-page report. All these facts strongly discredit the original statements, and illustrate that there are issues of *credibility* to be determined by the jury, in the event that the Colombian Nationals are (a) deposed; and (b) their testimony is admitted at trial thereafter.

The Government also spends ample time, in its Response, arguing that the proposed testimony would be cumulative. However, these arguments also fail to comprehend the nature of relief afforded by the Rule 15 motion at issue here. A motion to depose a prospective witness under Rule 15(a) determines only that a deposition be had at all, not whether it may ultimately be admitted at trial. *See United States v. Yates*, 438 F. 3d 1307, 1333 (11th Cir. 2006) ("[A] rule 15 deposition functions as a fallback procedure for obtaining testimony when a witness is unavailable."); *United States v. Bond*, 362 Fed. Appx. 18, 22 (11th Cir. 2010) ("A party in a criminal trial may move to depose a prospective witness to preserve her [or his] testimony for trial. . . . Once taken, the deposition *may be* admitted in whole or in part as evidence as provided by the Federal Rules of Evidence.").

It is "Rule 15(e) [which] allows a party to introduce the deposition as evidence if the deposition is otherwise admissible under the Federal Rules of Evidence." *Konrad*, 1996 U.S. Dist. LEXIS 18989 at *9-10. The argument that the Colombian Nationals have "cumulative" testimony, is an admissibility issue, which the Government may argue when the depositions at issue are offered at

trial. *See e.g., United States v. Gbenedio*, 95 F. 4th 1319 (11th Cir. 2024) ("Under Fed. R. Evid. 403, relevant evidence may be excluded if its probative value is substantially outweighed by a danger of needlessly presenting cumulative evidence."). In this case, the testimony of each of the Colombian Nationals is "material", and this is all that the Accused must prove to perpetuate the deposition of each of these witnesses. If the Government believes that the testimony will be cumulative, it should object to admissibility under Rule 403; however, these grounds do not justify a denial of the depositions in the first instance.

Ultimately, the issue is simple: "materiality" of the proposed testimony. This is not equivalent to "admissibility" of that testimony at trial. Furthermore, the only issue before this Court – in determining whether to permit the perpetuation of the testimony of the Colombian Nationals – is materiality, and not ultimate admissibility. In fact, District Courts have made clear that:

> The two most important factors in determining whether to allow a Rule 15 deposition to be taken are whether the witness is likely to be unavailable and whether their expected testimony is <u>material</u>. So, [sic] when prospective witnesses are unlikely to appear at trial and <u>their testimony is highly relevant to a central issue in the case</u> basic fairness requires permitting the moving party to preserve that testimony by deposing the witness.

*See United States v. Hafiz Muhammad Sher Ali Khan*, 2012 U.S. Dist. LEXIS 188320 *3 (S.D. Fla. Nov. 2, 2012) (emphasis added).

Further, to the extent that the Government challenges the credibility of the Colombian Nationals, this judgment is left to the sole province of the jury. *See e.g., United States v. Leflore*, 653 Fed. Appx. 703 (11th Cir. 2016) ("Weighing the credibility of a witness is exclusively within the province of the jury.").

The Accused have established both of the first factors to meet the "exceptional circumstances" test in Rule 15, and for this reason, the Court must grant their motion to perpetuate testimony, unless the Government's proposed "countervailing factors" of "timeliness", "safety" or

"willingness" of the Colombian Nationals to testify, truly render the taking of the depositions unjust. As discussed below, these factors do not rise to such a level.

### III.   THE GOVERNMENT'S BURDEN

### A. TIMELINESS

As a first "countervailing" factor, the Government alleges that "Defense counsel have [] enjoyed access to their clients, and the [] discovery [related to the Colombian Nationals] for years" [Response, pp. 9-10] and for this reason, the Court should deny the Rule 15 motion as untimely. In support of this position, the Government concedes that Rule 15 "is silent" as to when the motion must be made. The Government also recognizes that "most" decisions addressing "untimeliness" deal with motions filed on the eve of trial" [Response, p. 10] but nevertheless claims that this case is "unique" because it seeks to depose a large number of witnesses.

The Eleventh Circuit has spoken on the issue of timeliness in *United States v. Drogoul*, 1 F. 3d 1546 (11th Cir. 1993). The *Drogoul* case directs that "the moving party's diligence and the timing of the prospective depositions are relevant considerations to be weighed" in a Rule 15 motion. *Id.* at 1555-56. However, the "ultimate inquiry is whether exceptional circumstances exist and whether it is in the interest of justice to allow the deposition to be taken." *Id.* Under this standard, "absence a serious lack of due diligence" a party is not "precluded" from taking a Rule 15 deposition because such precedent would "frustrate, not expedite the administration of criminal justice." *Id.*

Likewise, as admitted by the Government, Courts in this District have permitted Rule 15 depositions, even where the order granting the same is made just "five days" prior to the start of trial. *See Konrad*, 1996 U.S. Dist. LEXIS 18989 (N.D. Ga. Nov. 27, 1996); *Bowe v. United States*, 2009 U.S. Dist. LEXIS 77857 *63, n. 29 (S.D. Ga. May 20, 2009) ("[The] cases that have denied Rule 15 motion[s] as untimely stress that the party seeking the deposition made the request too

close to the start of the trial, <u>rather than emphasizing that too much time has lapsed since the return</u> <u>of the indictment</u>."). The notion that timeliness would constitute a "countervailing interest" that would deny the Accused their right to a Rule 15 deposition in this case when trial is minimally months away is simply not based in fact or law. This is particularly true in a case like this, where: there are numerous defendant(s), the defendants face life in prison if convicted, a high profile international incident at issue, and allegations of torture surrounding numerous potential witnesses who are jailed in a foreign country.

B. SAFETY

In addition, the Government alleges that there are "safety and security concerns" that are more than mere "logistical issues," classifying Post au Prince, Haiti as "undoubtedly, at this time, the most dangerous city and most dangerous nation in the entire Western Hemisphere." [Response, pp. 12-13]. In support of their position that they would be in jeopardy of "being killed" if the depositions were ordered, the Government cites only one Eleventh Circuit decision, *United States v. Ramos*, 45 F. 3d 1519 (11th Cir. 1995). However, *Ramos* weighs in favor of the Accused's position here. In *Ramos*, the government opposed a Rule 15 motion on the following grounds:

> [The proposed deponent's] testimony was suspect because he [could not] be sanctioned for perjury; because the defense had neither taken nor scheduled the deposition when the magistrate vacated [an] order five days before trial, [and] it was unclear the deposition could actually be taken; deposing a suspected drug dealer at a place and time arranged by an undisclosed third party in Medellin, Colombia posed a serious threat to the prosecutor's safety; because the defense never detailed what the [deponent's] testimony would be, the testimony may have been irrelevant, cumulative, or inadmissible.

*Ramos*, 45 F. 3d at 1523. In response, the Eleventh Circuit simply stated: "We find that none of these factors, whether taken singly or together, render taking the deposition unjust." *Id.* at 1524. The court then emphasized that the "countervailing interest" factor focuses on "injustice to the defendant", and that none of the above cited concerns falls within such a category. *Id.*

Likewise, the Government attempts to distinguish *United States v. Khan*, 794 F. 3d 1288, 1207-08 (11th Cir. 2015) from the factors at issue herein. However, *Khan* solidifies that this Court should "go out of its way" to "accommodate" the Accused in furtherance of their Constitutional right to present a defense, and in the interest of truth and justice. In *Khan*, the Defendant moved to take the deposition of three (3) witnesses located in Pakistan. The Government theory of criminal liability was that Khan had sent money to support the Taliban in Pakistan. Khan claimed that the money was for an educational purpose. The Government claimed a series of diplomatic and practical obstacles including "security concerns" including the requirement that "the defense" get approval from Pakistani Government. Despite all these objections, the District Court granted the Rule 15 deposition but conditioned the Rule 15 on the Defense obtaining permission from the Government of Pakistan. The District Court in *Khan* engaged in efforts to facilitate the deposition despite the Government's contentions that diplomatic, safety, and practical impediments prohibited same. The District Court made every possible concession in favor of the Defense but for an intentional interruption in the video signal by Pakistan Government the deposition would have continued to its conclusion.

The Government concedes that virtual depositions can be accommodated. Indeed, the Government states that the United States Embassy in Haiti has a "strong preference" for a virtual deposition. [Response, pp. 15]. Indeed, , the Government acknowledges that the Haitian Minister of Justice has "agreed to permitting proposed depositions to occur virtually in Haiti" [Response, pp 15].Notwithstanding this, the Government maintains that because virtual depositions would "require further diplomatic inquiries" it amounts to more than a "mere logistical problem". Respectfully, however, any *inconvenience* to the Government in engaging in "diplomatic

inquiries" to facilitate this feat is wholly insufficient to overcome the strong need for the depositions in this case.

In addition, if the Court is not persuaded by the Government's own motion that virtual depositions would be acceptable to all parties, and possible, the Accused submit that the conditions are not as "dire" as the Government's motion suggests. First, counsel for one of the Accused has successfully submitted a bid for provision of soccer grass at the United States Embassy in Haiti. [Exhibit A]. It seems contrary to reason that the area is a "war zone" where no one can travel, when bids for travel to install grass are being actively procured and accepted. Similarly, the United States Embassy recently invited bids for gardening and landscape services at the Embassy. [Exhibit B]. It appears that they even suggest an "on-site" visit for the proposed contractors so that the scope of work can be fully ascertained. Likewise, the bid indicates that the selected contractor "shall" deliver services between the hours of 6:00AM and 6:00PM Monday through Saturday. It appears that there is no issue with contractors to appear on Embassy grounds, unescorted except by a contractor's supervisor throughout the day. These are merely examples which indicate that the situation in Haiti may not be as "unsafe" as the Government insinuates in its Response.

Regardless of whether the conditions have deteriorated to the extent that physical travel is impossible; there is simply no reason why virtual depositions cannot be conducted, and the Government's motion apparently concedes that both the United States and Haitian authorities have indicated that this is possible if not preferred. *Kahn* makes clear that this Court should permit virtual depositions, because both the United States Constitution, and general conceptions of justice require it.

C. <u>WILLINGNESS TO TESTIFY</u>

Finally, the Government contends that notwithstanding the fact that nearly every Colombian National personally executed a statement of willingness to testify, there is no "credible evidence" to this effect. This argument can be laid to rest without strong consideration. Fifth Amendment rights are personal. *See United States v. Dawson*, 2006 U.S. Dist. LEXIS 104040 (S.D. Fla. Jul. 6, 2006) ("The Fifth Amendment right against self-incrimination is also a purely personal right and therefore cannot be vicariously asserted."). For this reason, an attorney cannot claim the Fifth Amendment privilege on his client's behalf, and instead the "client should and must be permitted to make [that decision] for himself." *See United States v. Willis*, 145 F. Supp. 365 (M.D. Fla. 1955). In the first Rule 15 motion, the Accused submitted the affidavit of counsel representing the Colombian Nationals in humanitarian efforts. This Court denied that motion, without prejudice, specifically so that the Accused may obtain proof from the Colombian Nationals that they, personally, would submit to the depositions, if the Rule 15 motion were granted.

The Accused did precisely this. Notwithstanding the logistical issues of procuring such statements, sixteen of the seventeen Colombian Nationals executed a statement, stating that they would submit to "go as a witness" in the case "that is being conducted in the United States." [Response, Exhibit]. These statements, from the Colombian Nationals are sufficient to indicate the cooperation of the witnesses to participate in depositions in connection with this case. However, if these written statements are still insufficient, we now have **consent** from the Colombians Haitian Criminal Defense Lawyer Natalie Delisca [Exhibit C].

Furthermore, there are serious questions as to whether the Fifth Amendment privilege is even applicable in this case. The Government repeatedly classifies the testimony of the Colombian Nationals as "self-serving" in the Response and claims that the witnesses will merely deny any

wrongdoing; deny any plan to assassinate President Moise; and deny any involvement in such assassination. Under these circumstances it is dubious whether the Fifth Amendment even applies. In that respect, the invocation of the Fifth Amendment *depends* on the fact that certain testimony will be "incriminating". *See United States v. King*, 623 Fed. Appx. 962 (11th Cir. 2015) ("The Fifth Amendment provides that no person shall be compelled in any criminal case to be a witness against himself. A witness can assert her Fifth Amendment right in any proceeding here her answers might incriminate her in future criminal proceedings."); *First Tenn. Bank Nat'l Ass'n v. Serv. Foods*, 2017 U.S. Dist. LEXIS 228776 (N.D. Ga. Jan. 10, 2017) (finding that the Fifth Amendment applies only when an "answer [to questioning] might tend to subject [the party] to criminal responsibility."). As noted above, the proposed testimony appears to be purely exculpatory to the Colombian Nationals, and as such would not implicate their Fifth Amendment right to remain silent, or stand as a shield to their testimony, if it were compelled.

This leaves only the question of whether the Colombian Nationals are "cooperative", or stated differently, will appear. The Colombian Nationals have expressly indicated, in writing, that they are willing to be depose and willing to cooperate by bearing witness in this case. Even assuming that the Fifth Amendment were applicable – where the testimony given by these witnesses will be exculpatory as to their liability – their personal indication of willingness to appear and be questioned in connection with the case is all that is required to satisfy the court's previous concerns. The Government's insistence on more is not based on any legal authority and is contrary to the plain script of the Fifth Amendment as well as its practical application.

## CONCLUSION

**WHEREFORE**, the Accused respectfully request this Court: (1) grant this Motion pursuant to Rule 15, as to each of the proposed Colombian Nationals; and (2) overrule the

Government's objection and/or opposition; and (3) <u>order</u> any reasonable restrictions regarding the method of deposition, including the requirement that all depositions be virtually conducted, in order to ensure the safety of the Government, and members of the defense; and (4) <u>order</u> that the depositions be set down as soon as practicable under the circumstances, but in no event less than 60 days from the date of this order; and (5) <u>award</u> all other relief deemed just and necessary under the circumstances.

Respectfully Submitted,

/s/ Emmanuel Perez
Emmanuel Perez, Esquire
Fla. Bar No. 586552
Emmanuel Perez & Associates, P.A.
901 Ponce De Leon Boulevard, Suite 101
Coral Gables, Florida 33134
Tel: (305) 442-7443
Fax: (305) 441-9218
Email: courtmail@lawperez.com

## CERTIFICATE OF SERVICE

I HEREBY certify that on May 13, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which sent e-mail notification of such filing to all CM/EFC participants in this case.

By: /s/ Emmanuel Perez
Emmanuel Perez, Esquire



**EXHIBIT**

A

United States Department of State

*Port-au-Prince, Haiti*

Date: **January 16, 2025**

Request No:PR15106168

From: Contracting Officer
General Services Office
US Embassy, Port-au-Prince, Haiti

E-mail: ; QuinnLA@state.gov / bienvenuej@state.gov

Phone: 509 2229-8000 | 8341

The US Embassy, Port-au-Prince has an opportunity for Open Market Offerors to participate in bidding for ''Grass for the Embassy Soccer Ground''. This will be a Firm-Fixed Price Purchase Order and bids from all potential offerors will be accepted based on assurance of genuine quality, lead time for delivery and competitive pricing.

Offerors are encouraged to submit their bids before the deadline.

**1 Item's Description**

| # | Description | Qty |
|---|-------------|-----|
| 1 | GRASS FOR THE EMBASSY SOCCER GROUND | 9,687 Square Foot |

**2. Quote's Submission Due Date:**

The Quotations must be submitted electronically with subject line "Quotation for RFQ#19HA7025Q0008 Grass for the Embassy Soccer Ground 9687 Square Foot.
and must be received on or before Close of Business (COB) **Monday, January 27, 2025, before 8:00 O'clock**. No quotation will be accepted after the deadline. Submit your quotations to the following email address:

QuinnLA@state.gov | bienvenuej@state.gov

## 3. Requirements:

a) Prepare your quotation on your company letterhead in accordance with the requested details of this RFQ.
b) Please include list of your clients, you sold similar items within the last two years.
c) Delivery Period after receiving of Purchase Order
d) Bid must be valid for 30 days from the closing date for this solicitation.
e) Acceptance of our Net 30 days payment terms.
f) Bidder must have a physical business address and good financial health Provide evidence for business address.
g) Please provide reference of our Request Number **19HA7025Q0008** in all your correspondence regarding this RFQ.
h) Please note that U.S. Embassy is exempted from applicable taxes, therefore, submit tax free quote. The Tax Exemption Certificate may be provided by the Embassy after obtaining from Ministry of Foreign Affairs upon receipt of Proforma Invoice. This certificate's provision may take time of 45 – 60 days.

## 4. Terms & Conditions:

### a) Mode of Payment:

Payment will be processed through EFT within 30 days of the date that a correct invoice conforming to the provisions of the Purchase Order is received at the Financial Management Office, US Embassy and satisfactory completion of the delivery of acceptable items at the given Delivery Address.

### b) Delivery Schedule & Address:

The delivery is required to be made within a month or before after receiving the Purchase Order. The delivery is required at **Blvd 15 Octobre, Tabarre 41.** The transportation & loading/offloading will be at part of the vendor.

### c) Inspection & Acceptance:

The Embassy reserves the rights to return the goods if specifications are not found as required per this Solicitation and return shipment charges will be at part of the vendor.

## 5. FAR/ DOSAR Clauses applies on this Solicitation:
FAR & DOSAR (attached) clauses will apply to this Procurement. These clauses can be accessed through following link:

FAR 52.252-2 Clauses Incorporated by Reference (FEB 1998)

SBU - CONTRACTING AND ACQUISITIONS

his purchase order or BPA incorporates the following clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this address: https://www.acquisition.gov/far

DOSAR clauses may be accessed at: http://www.statebuy.state.gov/dosar/dosartoc.html

### FEDERAL ACQUISITION REGULATION (48 CFR Chapter 1) CLAUSES NUMBER

| NUMBER | TITLE | DATE |
|---|---|---|
| 52.204-9 | Personal Identity Verification of Contractor Personnel (if contractor requires physical access to a federally controlled facility or access to a federal information system) | JAN 2011 |
| 52.212-4. | Contract Terms and Conditions – Commercial Items (Alternate I (MAY 2014) of 52.212-4 applies if the order is time-and-materials or labor-hour) | JAN 2017 |
| 52.225-19 | Contractor Personnel in a Diplomatic or Consular Mission Outside the United States (applies to services at danger pay posts only) | MAR 2008 |
| 52.227-19 | Commercial Computer Software License (if order is for software) | DEC 2007 |
| 52.228-3 | Workers' Compensation Insurance (Defense Base Act) (if order is for services and contractor employees are covered by Defense Base Act insurance) | JUL 2014 |
| 52.228-4 | Workers' Compensation and War-Hazard Insurance (if order is for services and contractor employees are not covered by Defense Base Act insurance) | APR 1984 |
| 52.249-2 | Termination for Convenience of the Government (Fixed Price) | Apr 2012 |

_____End_____

Quinn, Laura A
General Service Officer



**EXHIBIT**

*B*

TABLE OF CONTENTS

## SECTION 1 - THE SCHEDULE

- SF 1449 cover sheet

- Continuation To SF-1449, RFQ Number **19HA7025Q0005**, Prices, Block 23

- Continuation To SF-1449, RFQ Number **19HA7025Q0005**, Schedule Of Supplies/Services, Block 20 Description/Specifications/Work Statement

- Attachment 1 to Description/Specifications/Performance Work Statement, Government Furnished Property

## SECTION 2 - CONTRACT CLAUSES

- Contract Clauses
- Addendum to Contract Clauses - FAR and DOSAR Clauses not Prescribed in Part 12

## SECTION 3 - SOLICITATION PROVISIONS

- Solicitation Provisions
- Addendum to Solicitation Provisions - FAR and DOSAR Provisions not Prescribed in Part 12

## SECTION 4 - EVALUATION FACTORS

- Evaluation Factors
- Addendum to Evaluation Factors - FAR and DOSAR Provisions not Prescribed in Part 12

## SECTION 5 - REPRESENTATIONS AND CERTIFICATIONS

- Offeror Representations and Certifications
- Addendum to Offeror Representations and Certifications - FAR and DOSAR Provisions not Prescribed in Part 12

| SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS<br>*OFFEROR TO COMPLETE BLOCKS 12, 17, 23, 24, & 30* | | 1. REQUISITION NUMBER<br>PR15021463 | | PAGE 1 OF | |
|---|---|---|---|---|---|
| 2. CONTRACT NO. | 3. AWARD/EFFECTIVE<br>DATE | 4. ORDER NUMBER | 5. SOLICITATION NUMBER<br>19HA7025Q0005 | | 6. SOLICITATION ISSUE DATE<br>01/06/2025 |

| 7. FOR SOLICITATION<br>INFORMATION CALL: ▶ | a. NAME<br>Gaelle Lucien | b. TELEPHONE NUMBER(No collect<br>calls)<br>+509 2229-8629 | 8. OFFER DUE DATE/    LOCAL<br>TIME<br>01/20/2025 |
|---|---|---|---|

| 9. ISSUED BY                          CODE   19HA70<br>US Embassy Port-au-Prince<br>Blvd du 15 Octobre, Tabarre 41<br>ATTN: GSO / Procurement<br>Port-au-Prince , Haiti | 10. THIS ACQUISITION IS    ☐ UNRESTRICTED OR    ☐ SET ASIDE:____ % FOR:<br><br>☐ SMALL BUSINESS    ☐ WOMEN-OWNED SMALL BUSINESS<br><br>☐ HUBZONE SMALL         ☐ (WOSB) ELLIGIBLE UNDER THE WOMEN-OWNED<br>    BUSINESS              SMALL BUSINESS PROGRAM    NAICS:<br><br>☐ SERVICE-DISABLED      ☐ EDWOSB<br>    VETERAN-OWNED<br>    SMALL BUSINESS    ☐ 8 (A)              SIZE STANDARD: |
|---|---|

| 11. DELIVERY FOR FOB DESTINAT-<br>TION UNLESS BLOCK IS<br>MARKED<br><br>☐ SEE SCHEDULE | 12. DISCOUNT TERMS | ☐ 13a. THIS CONTRACT IS A<br>RATED ORDER UNDER<br>DPAS (15 CFR 700) | 13b. RATING<br><br>14. METHOD OF SOLICITATION<br>☐ RFQ    ☐ IFB    ☐ RFP |
|---|---|---|---|

| 15. DELIVER TO                        CODE   19HA70<br>US Embassy Port-au-Prince<br>Blvd du 15 Octobre, Tabarre 41<br>ATTN: GSO / Procurement<br>Port-au-Prince , Haiti | 16. ADMINISTERED BY                        CODE   19HA70<br>US Embassy Port-au-Prince<br>Blvd du 15 Octobre, Tabarre 41<br>ATTN: GSO / Procurement<br>Port-au-Prince , Haiti |
|---|---|

| 17a. CONTRACTOR/         CODE         FACILITY<br>OFFERER                              CODE | 18a. PAYMENT WILL BE MADE BY                  CODE   19HA70<br>US Embassy Port-au-Prince<br>Blvd du 15 Octobre, Tabarre 41<br>ATTN: FMC<br>Port-au-Prince , Haiti |
|---|---|
| ☐ 17b. CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN<br>OFFER | 18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK<br>BELOW IS CHECKED    ☐ SEE ADDENDUM |

| 19.<br>ITEM NO. | 20.<br>SCHEDULE OF SUPPLIES/SERVICES | 21.<br>QUANTITY | 22.<br>UNIT | 23.<br>UNIT PRICE | 24.<br>AMOUNT |
|---|---|---|---|---|---|
| | *(Use Reverse and/or Attach Additional Sheets as Necessary)* | | | | |

| 25. ACCOUNTING AND APPROPRIATION DATA | 26. TOTAL AWARD AMOUNT  *(For Govt. Use Only)* |
|---|---|

| ☐ 27a. SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1, 52.212-4. FAR 52.212-3 AND 52.212-5 ARE ATTACHED. ADDENDA | ☒ ARE  ☐ ARE NOT ATTACHED |
|---|---|
| ☐ 27b. CONTRACT/PURCHASE ORDER INCORPORATES BY REFERENCE FAR 52.212-4. FAR 52.212-5 IS ATTACHED. ADDENDA | ☐ ARE  ☐ ARE NOT ATTACHED |

| ☐ 28. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN ____<br>COPIES TO ISSUING OFFICE. CONTRACTOR AGREES TO FURNISH AND DELIVER ALL<br>ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL<br>SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED HEREIN. | ☐ 29. AWARD OF CONTRACT: REF. _____ OFFER DATED ____<br>YOUR OFFER ON SOLICITATION (BLOCK 5), INCLUDING ANY<br>ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN, IS ACCEPTED AS<br>TO ITEMS: |
|---|---|
| 30a. SIGNATURE OF OFFEROR/CONTRACTOR | 31a. UNITED STATES OF AMERICA *(SIGNATURE OF CONTRACTING OFFICER)*<br><br>LAURA GUTRY |
| 30b. NAME AND TITLE OF SIGNER *(Type or print)* | 30c. DATE SIGNED | 31b. NAME OF CONTRACTING OFFICER *(Type or print)* | 31c. DATE SIGNED<br>1/6/25 |

| AUTHORIZED FOR LOCAL REPRODUCTION<br>PREVIOUS EDITION IS NOT USABLE | Computer Generated | STANDARD FORM 1449 (REV. 02/2012)<br>Prescribed by GSA - FAR (48 CFR) 53.212 |
|---|---|---|

SBU - CONTRACTING AND ACQUISITIONS

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

**32a. QUANTITY IN COLUMN 21 HAS BEEN**

☐ RECEIVED ☐ INSPECTED ☐ ACCEPTED, AND CONFORMS TO THE CONTRACT, EXCEPT AS NOTED: _____

| 32b. SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | 32c. DATE | 32d. PRINTED NAME AND TITLE OF AUTHORIZED GOVERNMENT REPRESENTATIVE |
|---|---|---|
| 32e. MAILING ADDRESS OF AUTHORIZED GOVERNMENT REPRESENTATIVE | | 32f. TELEPHONE NUMBER OF AUTHORIZED GOVERNMENT REPRESENTATIVE |
| | | 32g. E-MAIL OF AUTHORIZED GOVERNMENT REPRESENTATIVE |

| 33. SHIP NUMBER | 34. VOUCHER NUMBER | 35. AMOUNT VERIFIED CORRECT FOR | 36. PAYMENT | | 37. CHECK NUMBER |
|---|---|---|---|---|---|
| ☐ PARTIAL   ☐ FINAL | | | ☐ COMPLETE   ☐ PARTIAL   ☐ FINAL | | |
| 38. S/R ACCOUNT NO. | 39. S/R VOUCHER NO. | 40. PAID BY | | | |

| 41.a. I CERTIFY THIS ACCOUNT IS CORRECT AND PROPER FOR PAYMENT | | 42a. RECEIVED BY (Print) | |
|---|---|---|---|
| 41b. SIGNATURE AND TITLE OF CERTIFYING OFFICER | 41C. DATE | 42b. RECEIVED AT (Location) | |
| | | 42c. DATE REC'D (YY/MM/DD) | 42d. TOTAL CONTAINERS |

**STANDARD FORM 1449 (REV. 2/2012) BACK**

3

SBU - CONTRACTING AND ACQUISITIONS

U.S. Embassy *Port-au-Prince*
Date: *01/06/2025*

Dear Prospective Quoter:

Subject: Request for Quotations number *19HA7025Q0005*

Enclosed is a Request for Quotations (RFQ) for *Pool maintenance service*. If you would like to submit quotation, follow the instructions in Section 3 of the solicitation, complete the required portions of the attached document, and submit it to the address shown on the Standard Form 1449 that follows this letter.

The U.S. Government intends to award a contract/purchase order to the responsible company submitting an acceptable offer at the lowest price. We intend to award a contract/purchase order based on initial quotations, without holding discussions, although we may hold discussions with companies in the competitive range if there is a need to do so.

The Embassy intends to conduct a pre-quotation conference online. The pre-proposal conference will be held on *January 9th 2025 at 10:00 AM* (local time). Prospective offerors/quoters should contact *Lucieng@state.gov* by *January 8th 2025 at 1:00 PM* for additional information or to request meeting's details.

Quotations are due by *January 20th 2025 at 2:00 PM*. No quotations will be accepted after this time. Proposals must be in English and incomplete proposals will not be accepted.

Your quotation must be submitted electronically to *Quinnlu@state.gov and Lucieng@state.gov*. It is important to make sure the submission is made in specific size and format; in MS-Word 2007/2010 or MS-Excel 2007/2010 or Adobe Acrobat (pdf) file format. The file size must not exceed 30MB. If the file size should exceed the 30MB, the submission must be made in separate files and attached to separate emails with less than 30MB each.

In order for a quotation to be considered, you must also complete and submit the following:

1. SF-1449
2. Section I, Pricing
3. Section 5 Representations and Certifications
4. Additional information as required in Section 3
5. Proof of SAM Registration

4

SBU - CONTRACTING AND ACQUISITIONS

Offerors shall be registered in the SAM (System for Award Management) database at https://www.sam.gov prior to submittal of their offer/proposal as prescribed under FAR 4.1102. Failure to be registered at time of proposal submission may deem the offeror's proposal to be considered non-responsible and no further consideration will be given. Therefore, offerors are highly encouraged to register immediately if they are interested in submitting a response to this requirement.

Sincerely,

Laura Quinn
Contracting Officer

Enclosure:

5

SBU - CONTRACTING AND ACQUISITIONS

SECTION 1 - THE SCHEDULE
CONTINUATION TO SF-1449
RFQ NUMBER **19HA7025Q0005**
PRICES, <u>BLOCK 23</u>

I.   <u>PERFORMANCE WORK STATEMENT</u>

A.  The purpose of this firm fixed price purchase order is for **Pool *maintenance service*** in accordance with Attachment A.

B.  The contract will be for a one-year period from the date of the contract award, with **four** one-year options.

II. <u>PRICING</u>

2.1 Base Year :

From February 1st, 2025to January 31st 2026

| Site | Pool volume /  m$^3$ | Qty of service | Unit Price USD | Total Price USD |
|------|---------------------|----------------|----------------|-----------------|
| Stecher Roumain Compound | 510 m$^3$ | | | |
| Chancery Compound NEC | 265 m$^3$ | | | |
| Chief of Mission Residence | 250 m$^3$ | | | |
| Deputy Chief of Mission Residence | 80 m$^3$ | | | |
| Canne-à-Sucre | 273 m$^3$ | | | |
| | | | **Total Base year** | |

2.2 Option year 1:

From February 1st 2026 to January 31st 2027

| Site | Pool volume /  m$^3$ | Qty of service | Unit Price USD | Total Price USD |
|------|---------------------|----------------|----------------|-----------------|
| Stecher Roumain Compound | 510 m$^3$ | | | |
| Chancery Compound NEC | 265 m$^3$ | | | |
| Chief of Mission Residence | 250 m$^3$ | | | |

6

| Deputy Chief of Mission Residence | 80 m$^3$ | | | |
|---|---|---|---|---|
| Canne-à-Sucre | 273 m$^3$ | | | |
| | | | **Total Option year 1** | |

### 2.3 Option year 2:

From February 1st 2027 to January 31st 2028

| Site | Pool volume / m$^3$ | Qty of service | Unit Price USD | Total Price USD |
|---|---|---|---|---|
| Stecher Roumain Compound | 510 m$^3$ | | | |
| Chancery Compound NEC | 265 m$^3$ | | | |
| Chief of Mission Residence | 250 m$^3$ | | | |
| Deputy Chief of Mission Residence | 80 m$^3$ | | | |
| Canne-à-Sucre | 273 m$^3$ | | | |
| | | | **Total Option year 2** | |

### 2.4 Option year 3:

From February 1st 2028 to January 31st 2029

| Site | Pool volume / m$^3$ | Qty of service | Unit Price USD | Total Price USD |
|---|---|---|---|---|
| Stecher Roumain Compound | 510 m$^3$ | | | |
| Chancery Compound NEC | 265 m$^3$ | | | |
| Chief of Mission Residence | 250 m$^3$ | | | |
| Deputy Chief of Mission Residence | 80 m$^3$ | | | |
| Canne-à-Sucre | 273 m$^3$ | | | |
| | | | **Total Option year 3** | |

SBU - CONTRACTING AND ACQUISITIONS

2.5 Option Year 4:

From February 1st 2029 to January 31st 2030

| Site | Pool volume / $m^3$ | Qty of service | Unit Price USD | Total Price USD |
|------|---------------------|----------------|----------------|-----------------|
| Stecher Roumain Compound | 510 $m^3$ | | | |
| Chancery Compound NEC | 265 $m^3$ | | | |
| Chief of Mission Residence | 250 $m^3$ | | | |
| Deputy Chief of Mission Residence | 80 $m^3$ | | | |
| Canne-à-Sucre | 273 $m^3$ | | | |
| **Total Base year** | | | | |

2.6 Total base year + four one-year option

| | |
|------|------|
| Total Base year | |
| Total Option year 1 | |
| Total Option year 2 | |
| Total Option year 3 | |
| Total Option year 4 | |
| **Total All years** | |

III. VALUE ADDED TAX

VALUE ADDED TAX.  Value Added Tax (VAT) is not applicable to this contract and shall not be included in the CLIN rates or Invoices because the U.S. Embassy has a tax exemption certificate from the host government.

IV. SCOPE OF WORK

**1- DESCRIPTION**

The purpose of this contract is to obtain pool maintenance services for real property owned or managed by the U.S. Government at U.S. Embassy Port-au-Prince. The Contractor shall perform maintenance services for all designated systems and equipment.

8

## 1.2. GENERAL REQUIREMENTS

Preventive Maintenance and Pool Cleaning services for major system and equipment installed inside the compound and related to the operation of the U.S. properties are an important part of the representational responsibilities of the U.S. mission. The Government will measure the Contractor's work by the preventive maintenance services provided. These services shall result in all systems being serviced under this agreement being in good operational condition when activated and covered by this contract. The Contractor shall perform complete maintenance services as described in this contract for all Government properties listed in 1.4. The Contractor shall provide documentation that they have the experience and expertise needed to fulfill the needs of the contract.  The Contractor shall include all planning, administration, and management necessary to assure that all services comply with the contract, the COR's schedules and instructions, and all applicable laws and regulations. The Contractor shall meet all the standards of performance identified in the contract. The Contractor shall perform all related support functions such as supply, subcontracting, quality control, financial oversight, and maintenance of complete records and files.

## 1.3. MANAGEMENT AND SUPERVISION

### 1.3.1. SUPERVISION.
The Contractor shall designate a representative who shall be always responsible for on-site supervision of the Contractor's workforce. This supervisor shall be the focal point for the Contractor and shall be the point of contact with U.S. Government personnel. The supervisor shall have sufficient English language skill to be able to communicate with members of the U.S. Government staff. The supervisor shall have supervision as his or her sole function.

### 1.3.2. SCHEDULES.
The Contractor shall maintain work schedules. The schedules shall take into consideration the hours that the staff can effectively perform their services without placing a burden on the security personnel of the Post. The Contractor shall deliver standard services between the hours of *6:00 AM and 6:00 PM Monday through Saturday*. For those items other than routine daily services, the Contractor shall provide the COR with a detailed plan as to the personnel to be used and the time frame to perform the service.

### 1.3.3. QUALITY CONTROL.
The Contractor shall be responsible for quality control. The Contractor shall perform inspection visits to the work site on a regular basis. The Contractor shall coordinate these visits with the COR. These visits shall be surprise inspections to those working on the contract.

9

### 1.3.4 TECHNICAL GUIDANCE

The Model Aquatic Health Code, published by the Center for Disease Control and Prevention every two years, shall be the guiding reference for water quality and maintenance standards.
2018 MAHC Code (3rd Edition) – 07/18/2018 pdf icon [PDF – 195 pages]
2018 MAHC Annex (3rd Edition) – 07/18/2018 pdf icon [PDF – 270 pages]

The Contractor shall have the services of qualified personnel with experience in Pool maintenance and who will cause minimal inconvenience to guests while maintaining the pool. Training for contractor personnel shall include at a minimum:
1) How to recognize and avoid chemical hazards
2) The physical and health hazards of chemicals used at the facility
3) How to detect the presence or release of a hazardous chemical
4) Required PPE necessary to avoid the hazards.
5) Use of PPE
6) Chemical spill response; and
7) How to read and understand the chemical labels or other forms of warning including SDS sheets.
8) How to ensure safety procedures to clean the pool
9) Training shall be documented and available to the COR

### 1.3.5. PERFORMANCE STANDARD

The Contractor shall submit an annual Pool Maintenance Plan that reflects the proposed frequency for meeting the requirements of this contract. The aquatic facility preventive maintenance plan shall include details and frequency of owner/operator's planned routine facility inspection, maintenance, and replacement of recirculation and water treatment components. The Plan will be developed to reflect each pool and each system and equipment. Pools shall be clean and in good operating condition upon completion of the service. The preventive maintenance service shall result in the parts of the system serviced being in a condition to operate efficiently and effectively. The Contractor shall submit the Pool Maintenance Plan to the COR for approval within 30 days after contract award.

### 1.3.6 SAFETY AND MATERIALS

The Contractor shall inventory, supply, and replace expendable parts. The Contractor shall maintain a supply of expendable and common parts on site so that these are readily available for normal maintenance to include filters, chlorine, clarifier, PH balance tester, turbidity tester etc., in addition to the appropriate tools, testing equipment.
The Contractor is responsible for maintaining a safe and orderly working environment, proper storage of materials, keeping the pool area hazard free, and providing safety shoes, apparel, and PPE for technicians, (hands, hearing, eye protection, life vest).

10

MSDS must be maintained on site for each chemical and cleaner.

Pool maintenance supplies: The contractor shall inventory the supply after each visit and order replacement supplies to avoid gaps in stock and have them delivered on site. Maintenance materials/supplies shall be unused and are to be industry standard and intended for the task to be performed. Parts shall be OEM approved.

### 1.3.7 CONTRACT MANAGEMENT by U.S.G.

The U.S.G. will designate a COR (Contracting Officer's Representative) to act as the main point of contact and respond to technical questions that the Contractor may have.

### 1.4. POOL MAINTENANCE

### 1.4.0 MATERIALS AND EQUIPMENT

The contractor is responsible to provide the pool with testing equipment for the determination of disinfectant residuals and pH concentration specific to the disinfecting agent being used. The contractor shall provide all basic materials such as chlorine, Algae clear or all clear to maintain the pool in good condition all the times.

The disinfectant residual tester shall have a range of at least 0.1 to 5.0 mg/l.

The pH tester shall be able to indicate pH between 6.0 and 8.0. Test kit chemicals shall be replaced according to manufacturer's recommendations. Chemicals must be stored in accordance with manufacturer's recommendations. Materials provided shall be approved by Post Occupational Safety and Health Officer, be SHEM approved, and presented to the Embassy COR before usage.

### 1.4.1 STANDARD QUALITY.

Pool water must be maintained at the following minimum values:

a. pH between 7.2 and 7.8.

b. Alkalinity (TA) in tiles pools must be between 80 and 110 ppm

c. Hardness must be between 200 and 275 ppm

d. Turbidity (clarity) must be less than 0.5 nephelometric turbidity units (NTU). At times of peak bather loads, the turbidity is allowed to increase to 1.0 NTU but must return to 0.5 NTU within 6 hours (NSPF 2005).

e. The target range for residual or free available chlorine is 1-3 ppm

Total chlorine residuals shall be no greater than 1 milligram per liter above free chlorine levels. (Break Point chlorination shall be performed when total chlorine residuals are 1 mg/l or greater.)

f. Maximum period of non-conformity for water quality shall be no more than 7 days from first log entry detailing non-conformity, regardless of weather conditions.

11

Any of the following violations are imminent health hazards which shall require immediate correction or immediate pool closure:
1. Failure to provide supervision and staffing of the aquatic facility as prescribed in this contract.
2. Failure to provide the minimum disinfectant residual levels listed in various sections of MAHC code
3. Ph level below 6.5
4. Ph level above 8.0
5. Failure to continuously operate the pool filtration and disinfection equipment
6. Use of an unapproved or contaminated water supply source for potable water use
7. Non GFCI protected electrical receptacles within 20 feet of the inside wall of the aquatic venue
8. Absence of all required lifesaving equipment on deck
9. Aquatic venue bottom not visible
10. Failure to provide and maintain an enclosure or barrier to inhibit unauthorized access to the aquatic facility or aquatic venue when required
11. Use of unapproved chemicals or the application of chemicals by unapproved methods to the water
12. Broken, unsecured, or missing main drain grate or any submerged suction outlet grate in the aquatic venue
13. Broken glass or sharp objects in aquatic venue or on deck area; or
14. Any other item determined to be a public health hazard by the AHJ.

## 1.4.2 REGULAR SERVICE
The contractor is responsible to maintain the pool including the water circulation system, cleaning all pool materials. The chemicals should be maintained in proper storage area.

The Contractor is responsible for the following Swimming Pool tasks as often as necessary to maintain pool chemistry with the five target ranges above on part 1.4.1.
The contractor shall inspect and perform the following check and record (log) DAILY regarding the schedule:

- Check the recirculation system and assure continuous operation 24 hours per day.

- Removing debris and leaves from the pool on the surface and bottom. Splash water on the tile and pick up leaves and other debris. Using a leaf skimmer or leaf rake, remove debris first from the surface and then from the bottom to remove sediment.

- Vacuum the pool. The pool will be vacuumed every visit as heavy use or wind and rain will bring in an extra heavy dose of debris. The vacuum hose must be filled with water before it is attached to the filter line. If a nylon brush is part of the vacuum head, it shall

12

be adjusted so it touches the floor and dislodges embedded dirt. When the wheels and brushes are so worn that they can no longer be adjusted, they shall be replaced.

- Tiles: The tiles must be kept in neat condition. Regularly clean them to remove the calcium build-up from the pool with pumice stone or stain or scale remover. The cleaning must be regularly scheduled.

- Clean the tiled floors and walls of the pool. The scum that forms on the tile at the waterline shall be cleaned with special tile cleaners that can be applied with a brush. Never use steel wool to clean tile because the iron particles can stain the finish. Remove light scale deposits from tile. Brush the walls in a uniform manner with a tough enough brush to remove the dirt that clings to the walls. Check and clean strainer baskets (skimmers) and hair/lint pot (pump). Before vacuuming and backwashing, make sure all debris is removed from the strainer baskets and hair lint pots to ensure maximum suction

- Weekly: Backwash and service/replace the filter when required. The equipment will be backwashed weekly and/or when required and thoroughly to guarantee its optimum state. In case that replacement is needed the contractor shall provide a quote to COR and Embassy will provide the required parts.

- Daily: Perform water testing and add chemicals as needed. Depending on the results of the water testing, chemicals might be needed to guarantee the water quality is within the safety requirements. The contractor will have a logbook to register all the final water testing results, it will be left in an accessible location close to the pool.

- Daily: Record daily the operation of the recirculating system, chemical additions, bather load, pH, TA, NTU, Cl and hardness and disinfectant residuals and monthly microbiological results shall be kept at the pool facility. Records must be available for inspection by interested parties during normal pool operating hours.

- Daily: Control and check daily the pool pump, pump motor, sand filters, strainers, and related system. All these equipment shall be maintained in good operating condition. The contractor must thoroughly check this equipment as part of the regular cleaning procedure and correct minor problems as they arise. In case the detected problem is major the contractor will report this to the COR. Refer to manufacturer's product manual when working with any piece of equipment

- Daily: Clean coping and decking. Use nonabrasive cleaners and sweep away from pool. Acceptable methods for cleaning outdoor pool decks are hosing and mopping. Hosing and cleaning movement must be directed away from the pool to prevent debris from

13

collecting around its edge or from being blown into it. High-pressure cleaning and scrubbing are accepted practices for maintaining nonslip decks

- Daily: The Contractor is responsible for updating daily the Pool Information Board located the at Stecher Roumain and Chancery pools. Pool Information Board will include the time-of-day readings were taken, the temperature of the water, Chlorine, and the pH level at time of testing.

## 1.4.3 EMERGENCY SERVICE

The contractor should be able to provide emergency service in case the pool starts to be green, or PH is out of balance or Chlorine level is too high or too low. All emergency calls should be answered in a 24-hour range regardless of Holidays and Sundays.

## 1.5 POOLS SPECIFICATIONS AND LOCATIONS

All standard services are to be delivered on regular Post Working days.

| Site | Pool Volume/ Unit of measure ($m^3$) | Location |
|------|--------------------------------------|----------|
| Stecher Roumain Compound | 510 $m^3$ | Tabarre 41, P-au-P |
| Chancery Compound NEC | 265 $m^3$ | Tabarre 41, P-au-P |
| Chief of Mission Residence | 250 $m^3$ | Rue Metreaux, Bourdon, P-au-P |
| Deputy Chief of Mission Residence | 80 $m^3$ | Puits Blain,Rte de Frères, P-au-P |
| Canne-à-Sucre | 273 $m^3$ | Tabarre 41, P-au-P |

## 2. WORKING HOURS

All work shall be performed during Monday through Saturday, between *6:00 AM and 6:00 PM Monday through Saturday* except for the holidays which will be arranged ad hoc, with the COR. Other hours such as regularly scheduled cleaning and maintenance times may be approved by the Contracting Officer's Representative. The Contractor must provide at least 24-hour advance notice to the COR who will consider any deviation from the hours identified above.

## 3. DELIVERABLES

The following items shall be delivered under this contract:

| DESCRIPTION | QUANTITY | DELIVERY DATE | DELIVER TO: |
|-------------|----------|---------------|-------------|
|             |          |               |             |

14

SBU - CONTRACTING AND ACQUISITIONS

| Insurance | 1 | 10 days after award | Contracting Officer |
| Maintenance Plan | 1 | 10 days after award | COR |
| List of Personnel | 1 | 10 days after award | COR |
| Payment Request | 1 | monthly | COR |

## 4. PERSONNEL REQUIREMENTS

**4.1 GENERAL**. The Contractor shall maintain discipline at the site and shall take all reasonable precautions to prevent any unlawful, riotous, or disorderly conduct by Contractor employees at the site. The Contractor shall preserve peace and protect persons and property on site. The Government reserves the right to direct the Contractor to remove an employee from the worksite for failure to comply with the standards of conduct. The Contractor shall immediately replace such an employee to maintain continuity of services at no additional costs to the Government.

## 4.2 STANDARD OF CONDUCT

**4.2.1 Uniforms and Personal Equipment.** The Contractor's employees shall wear clean, neat and complete uniforms when on duty. All employees shall wear uniforms approved by the Contracting Officer's Representative (COR).

**4.2.2 Neglect of duties** shall not be condoned. The Contractor shall enforce no sleeping while on duty, unreasonable delays or failures to carry out assigned tasks, conducting personal affairs during duty hours and refusing to render assistance or cooperate in upholding the integrity of the worksite security.

**4.2.3** Disorderly conduct, use of abusive or offensive language, quarreling, intimidation by words, actions, or fighting shall not be condoned. Also included is participation in disruptive activities, which interfere with normal and efficient Government operations.

**4.2.4 Intoxicants and Narcotics**. The Contractor shall not allow its employees while on duty to possess, sell, consume, or be under the influence of intoxicants, drugs or substances that produce similar effects.

• Criminal Actions. Contractor employees may be subject to criminal actions as allowed by law in certain circumstances. These include but are not limited to the following actions:
• Falsification or unlawful concealment, removal, mutilation, or destruction of any official documents or records or concealment of material facts by willful omission from official documents or records.
• Unauthorized use of Government property, theft, vandalism, or immoral conduct.
• Unethical or improper use of official authority or credentials.
• Security violations; or,

• Organizing or participating in gambling in any form.

## 4.2.6 KEY CONTROL.
The Contractor shall receive secure, issue and account for any keys issued for access to buildings, offices, equipment, gates, etc., for the purposes of this contract. The Contractor shall not duplicate keys without the COR's approval. Where it is determined that the Contractor or its agents have duplicated a key without permission of the COR, the Contractor shall remove the individual(s) responsible from this contract. If the Contractor has lost any such keys, the Contractor shall immediately notify the COR. In either event, the Contractor shall reimburse the Government for the cost of rekeying that portion of the system.

## 4.3. NOTICE TO THE GOVERNMENT OF LABOR DISPUTES
The Contractor shall inform the COR of any actual or potential labor dispute that is delaying or threatening to delay the timely performance of this contract.

## 4.4. PERSONNEL SECURITY

**4.4.1** After award of the contract, the Contractor shall provide the following list of data on each employee who will be working under the contract. The Contractor shall include a list of workers and supervisors assigned to this project. The Government will run background checks on these individuals. It is anticipated that security checks will take *30* days to perform. For everyone the list shall include:

• Full Name
• Place and Date of Birth
• Current Address
• Identification number
• Vehicle plate number and model

**4.4.2** Government shall issue identity cards to Contractor personnel, after they are approved. Contractor personnel shall always display identity card(s) on the uniform while providing services under this contract. These identity cards are the property of the US Government. The Contractor is responsible for their return at the end of the contract, when an employee leaves Contractor service, or at the request of the Government. The Government reserves the right to deny access to U.S.-owned and U.S.-operated facilities to any individual.

## 5. MATERIALS AND EQUIPMENT

The Contractor shall provide all necessary managerial, administrative and direct labor personnel, as well as all transportation, equipment, tools, supplies and materials required to perform

16

inspection, maintenance, and component replacement as required to maintain the systems in accordance with this work statement.

Contractor furnished materials shall include, but not limited to, any material needed to satisfactorily complete and deliver a high-quality product, the materials considered shall be: Cleaning accessories, different sizes and materials brushes, telescopic poles, vacuum cleaning equipment (vacuum head, vacuum hose, and hose-to- wall fitting items), cleaning chemicals, water treatment chemicals, containers and labels for any substance used, plastic bags and containers to pick-up debris and garbage. The contractor is responsible for removing all waste product to the nearest dumpster and not trash cans located poolside.

## 6. INSURANCE

**6.1** AMOUNT OF INSURANCE. The Contractor is required to provide whatever insurance is legally necessary. The Contractor shall, at its own expense, provide and maintain during the entire performance period the following insurance amounts:

**6.2** GENERAL LIABILITY (includes premises/operations, collapse hazard, products, completed operations, contractual, independent contractors, broad form property damage, personal injury)

```
1. Bodily Injury stated in US Dollars:
                    Cumulative                          100,000.00
2. Property Damage stated in US Dollars:
                    Cumulative                          100,000.00
```

**6.3** The types and amounts of insurance are the minimums required. The Contractor shall obtain any other types of insurance required by local law or that are ordinarily or customarily obtained in the location of the work. The limit of such insurance shall be as provided by law or sufficient to meet normal and customary claims.

**6.4** For those Contractor employees assigned to this contract who are either United States citizens or direct hire in the United States or its possessions, the Contractor shall provide workers' compensation insurance in accordance with FAR 52.228-3, or host country nationals that do not have a DOL waiver.

**6.5** The Contractor agrees that the Government shall not be responsible for personal injuries or for damages to:

- any property of the Contractor,
- its officers,
- agents,
- servants,
- employees, or
- any other person,

17

• Arising from an incident to the Contractor's performance of this contract. The Contractor shall hold harmless and indemnify the Government from all claims arising, except in the instance of gross negligence on the part of the Government.

**6.6** The Contractor shall obtain adequate insurance for damage to, or theft of, materials and equipment in insurance coverage for loose transit to the site or in storage on or off the site.

**6.7** Government as Additional Insured. The general liability policy required of the Contractor shall name "the United States of America, acting by and through the Department of State," as an additional insured with respect to operations performed under this contract.

**6.8** Time for Submission of Evidence of Insurance. The Contractor shall provide evidence of the insurance required under this contract within ten (10) days after contract award. The Government may rescind or terminate the contract if the Contractor fails to timely submit insurance certificates identified above.

## 7. LAWS AND REGULATIONS

**7.1** Without additional expense to the Government, the Contractor shall comply with all laws, codes, ordinances, and regulations required to perform this work. If there is a conflict between the contract and requirements of local law, the Contractor shall promptly advise the Contracting Officer of the conflict and of the Contractor's proposed course of action for resolution by the Contracting Officer.

**7.2** The Contractor shall comply with all local labor laws, regulations, customs, and practices pertaining to labor, safety, and similar matters, unless they are inconsistent with the requirements of this contract.

QUALITY ASSURANCE AND SURVEILLANCE PLAN (QASP)

This plan provides an effective method to promote satisfactory contractor performance. The QASP provides a method for the Contracting Officer's Representative (COR) to monitor Contractor performance, advise the Contractor of unsatisfactory performance, and notify the Contracting Officer of continued unsatisfactory performance. The Contractor, not the Government, is responsible for management and quality control to meet the terms of the contract. The role of the Government is to monitor quality to ensure that contract standards are achieved.

| Performance Objective | Scope of Work Paragraphs | Performance Threshold |
|---|---|---|
| Services. | 1 thru 7 | |

18

| Performs all **preventive maintenance** services set forth in the scope of work. | | All required services are performed and no more than one (1) customer complaint is received per month. |
| --- | --- | --- |

(a) SURVEILLANCE. The COR will receive and document all complaints from Government personnel regarding the services provided. If appropriate, the COR will send the complaints to the Contractor for corrective action.

(b) STANDARD. The performance standard is that the Government receives no more than one (1) customer complaint per month. The COR shall notify the Contracting Officer of the complaints so that the Contracting Officer may take appropriate action to enforce the inspection clause (FAR 52.212-4, Contract Terms and Conditions-Commercial Items), if any of the services exceed the standard.

(c) PROCEDURES.

(1) If any Government personnel observe unacceptable services, either incomplete work or required services not being performed they should immediately contact the COR.

(2) The COR will complete appropriate documentation to record the complaint.

(3) The COR determines the complaint is invalid, the COR will advise the complainant. The COR will retain the annotated copy of the written complaint for his/her files.

(4) If the COR determines the complaint is valid, the COR will inform the Contractor and give the Contractor additional time to correct the defect, if additional time is available. The COR shall determine how much time is reasonable.

(5) The COR shall, as a minimum, orally notify the Contractor of any valid complaints.

(6) If the Contractor disagrees with the complaint after investigation of the site and challenges the validity of the complaint, the Contractor will notify the COR. The COR will review the matter to determine the validity of the complaint.

(7) The COR will consider complaints as resolved unless notified otherwise by the complainant.

(8) Repeat customer complaints are not permitted for any services. If a repeat customer complaint is received for the same deficiency during the service period, the COR will contact the Contracting Officer for appropriate action under the Inspection clause.

SBU - CONTRACTING AND ACQUISITIONS

CONTINUATION TO SF-1449,
RFQ NUMBER *19HA7025Q0004*
SCHEDULE OF SUPPLIES/SERVICES, BLOCK 20
DESCRIPTION/SPECIFICATIONS/WORK STATEMENT

20

**EXHIBIT**

C

Port-au-Prince, Haiti – April 30, 2025

United States District Court
Southern District of Florida
Honorable Jacqueline Becerra

Subject: Authorization for Testimony of Witnesses – Jovenel Moïse Case

Honorable Judge Becerra:

I, **Natalie Delisca**, an attorney of Haitian nationality, acting in my capacity as legal representative of the Colombian citizens **Carlos Giovanny Guerrero Torres, Jheyner Alberto Carmona Florez, Ángel Mario Yarce Sierra, Edwin Blanquicet Rodríguez, Manuel Antonio Grosso Guarín, John Jairo Ramírez, Naiser Franco Castañeda, Gersain Mendivelso Jaimes, Enalber Vargas Gómez, Neil Cáceres Durán, Alex Miyer Peña, Jhon Jader Andela, Alejandro Giraldo Zapata, and John Jairo Suárez Alegría, Juan Carlos Yepes Clavijo, Francisco Eladio uribe Ochoa, Victor Albeiro Pineda Cardona** currently detained in Haiti in connection with the investigation into the assassination of President Jovenel Moïse, respectfully inform this Honorable Court that:

I formally authorize the appearance of my clients as defense witnesses in the legal proceedings currently being conducted in the United States relating to the aforementioned case. I am permitting them to testify and waive their Miranda rights.

I must also inform the Court, as a matter of urgency, that the lives and physical integrity of my clients are in serious danger due to the critical security situation in Haiti. In recent days, armed gangs operating in the country have escalated their threats, which are increasingly credible, regarding a potential incursion into the prison facility where these Colombian citizens are currently being held.

Therefore, I urgently request that the necessary steps and authorizations be initiated for their immediate transfer from Haiti to the United States, in order to safeguard their well-being and ensure their secure participation as witnesses in this case.

I remain at the disposal of this Honorable Court for any additional requirements necessary to proceed with the appropriate arrangements.

Respectfully,

Natalie Delisca
Defense Attorney

[Space reserved for notarization by Public Notary in Haiti]

Signature and seal of Notary: _____

Date: _MAY 06, 2025_

Name of Notary: _ALEX DEMOSTHENES_